# UNITED STATES DISTRICT COURT

for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:20-MJ-00485 |
| | ) | |
| 3601 Wade Street, Los Angeles, California 90066 | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1084 | Transmission of Wagering Information |
| 18 U.S.C. § 1955 | Operation of an Illegal Gambling Business |
| 18 U.S.C. § 1956(a)(2) | Internationally Laundering the Proceeds of an Illegal Gambling Business |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

*Michael Impastato, Special Agent*
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA

 Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Mitchell x0698

**AFFIDAVIT**

I, Michael Impastato, being duly sworn, depose and state:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Department of
Homeland Security - Immigration and Customs Enforcement –
Homeland Security Investigations ("HSI"), a federal agency
having responsibility for the investigation of the offenses as
to which the application is made.  I have been employed with HSI
since January 2004.  Shortly after beginning with HSI, I
attended the HSI SA Training Program at the Federal Law
Enforcement Training Center, where I received formal training in
various aspects of conducting financial, immigration, drug
trafficking, and gang investigations.  I have conducted numerous
criminal investigations and executed arrest and search warrants
for violations of federal and state laws.  I have training and
experience in interview techniques, arrest procedures, search
and seizure, search and arrest warrant applications,
investigations of various crimes, and physical and electronic
surveillance techniques.  Prior to joining HSI, I was an
Inspector with the U.S. Customs Service beginning in June of
2000.  When the Department of Homeland Security was created in
March of 2003 merging U.S. Customs Service with Customs and
Border Protection ("CBP"), I became a CBP Officer.  Currently, I
am assigned to the High Intensity Financial Crimes Area Task

Force at the HSI Los Angeles Field Office in Long Beach, California ("HSI LA"), where I have been assigned since June of 2014.  While at HSI LA, I have participated in the execution of arrest and search warrants involving trade fraud, drug trafficking, and money laundering.

2.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All figures, times, and calculations set forth herein are approximate.

## II.  **PURPOSE OF AFFIDAVIT**

3.    This affidavit is submitted in support of warrants to search property, described below and in greater detail in Attachments A-1 through A-4, incorporated herein by reference, for evidence related to the following violations:

a.    Transmission of wagering information, in violation of 18 U.S.C. § 1084;

b.    Operation of an illegal gambling business, in violation of 18 U.S.C. § 1955;[1] and

c.    Internationally laundering the proceeds of the illegal gambling business, in violation 18 U.S.C. § 1956(a)(2)(collectively, the "Subject Offenses").

### III. <u>THE SUBJECT PREMISES TO BE SEARCHED</u>

4.    This affidavit seeks authorization to search the following residences of target subjects of the investigation:

a.    SUBJECT PREMISES ONE is described in detail in Attachment A-1 and is located at 3601 Wade Street, Los Angeles, California 90066.  SUBJECT PREMISES ONE is believed to be the residence of target subject Matthew FUNKE ("FUNKE");

b.    SUBJECT PREMISES TWO is described in detail in Attachment A-2 and is located at 28 Castellina Drive, Newport Beach, California 92630.[2]  SUBJECT PREMISES TWO is believed to be the residence of target subject Wayne NIX ("NIX");

c.    SUBJECT PREMISES THREE is described in Attachment A-3 and is located at 3301 Clay St., Newport Beach, California

---

[1] Section 1955 prohibits gambling businesses that violate the state law where such businesses are conducted.  California Penal Code § 337a prohibits bookmaking and wagering bets based on "contest . . . of skill, speed or power of endurance of person or animal . . ."

[2] According to documents obtained during the investigation, SUBJECT PREMISES TWO is described as being located in both Newport Coast and Newport Beach; however, I understand that Newport Coast is a part of Newport Beach.

92663.  SUBJECT PREMISES THREE is believed to be the residence of target subject Kenneth ARESENIAN ("ARSENIAN"); and

        d.  SUBJECT PREMISES FOUR is described in Attachment A-4 and is located at 1043 W. 186th St., Gardena, California 90248. SUBJECT PREMISIS FOUR is believed to be the residence of target subject Howard MILLER ("MILLER").

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

        5.  In 2017, HSI LA and the Internal Revenue Service – Criminal Investigation Division ("IRS-CID") began investigating an online sports gambling website, www.sandislandsports.com (the "Subject Website"),[3] and associated targets in Southern California.  The Subject Website operates as a sports book where patron bettors place bets on a variety of sporting events.  The investigation revealed that FUNKE, NIX, MILLER, ARSENIAN and Edon KAGASOFF ("KAGASOFF") use the Subject Website to facilitate their own unlawful sports gambling business in the Los Angeles area.

        6.  While FUNKE, NIX, MILLER, ARSENIAN and KAGASOFF do not appear to have an ownership interest in the Subject Website, I believe that they have the ability to grant their patron bettors access to the Subject Website by issuing the patron a username

---

[3] An HSI trained Intelligence Research Specialist, using a domain registry search, determined that the Subject Website was created on June 4, 2008, and is registered in Costa Rica.

4

and password.  Based on my knowledge of this investigation, I know that after giving the patron access to the website, FUNKE, NIX, and KAGASOFF will set the bettors' credit lines or limits through the Subject Website.  I believe that ARSENAIAN and MILLER have similar abilities through the Subject Website.  When a patron is ready to place a bet on a sporting event, the patron will either (1) call in the bet to a phone number associated with the Subject Website and speak with one of the call center representatives, (2) contact the target subjects who act as "bookies" to place a bet, or (3) log into the Subject Website with a username and password and place a bet on a sporting event.  FUNKE, NIX, MILLER, ARSENIAN and KAGASOFF then collect gambling losses, and pay winnings, to patrons in the Los Angeles area.

### V.   STATEMENT OF PROBABLE CAUSE

A. BACKGROUND OF THE INVESTIGATION

7.   In September 2017, two patron bettors, herein identified as Confidential Informant One ("CI-1")[4] and

---

4  CI-1 does not have any criminal convictions, and has not received any payments from HSI or IRS-CID.  However, during his/her interview with IRS-CID, CI-1 expressed an interest in applying for an IRS award program that provides monetary rewards to tipsters if their information leads to a conviction.  CI-1 also stated he/she was willing to cooperate with law enforcement on this investigation to avoid paying a gambling debt of approximately $6 million he/she owes to FUNKE and his associates.

Confidential Informant Two ("CI-2"),[5] agreed to cooperate with
law enforcement.  I have met numerous times with CI-1 and CI-2
and have read reports of additional debriefs of them that I did
not attend.  According to CI-2, in order to access the Subject
Website, FUNKE, or another individual associated with the
Subject Website, must first provide a bettor with a user name
and password.[6]  Once a bettor gains access to the Subject
Website, bets are made against a line of credit.  According to
CI-2, certain individuals associated with the Subject Website
are able to raise a bettor's credit limit to allow for higher
bets to be placed.  Additionally, bettors are able to call
individuals associated with the Subject Website, such as FUNKE,
and place bets directly through that individual.  Following a
bettor's activity on the Subject Website, certain individuals
associated with the Subject Website, such as FUNKE, will meet
with the bettors in the Los Angeles area to collect gambling
losses or to pay out gambling winnings.

---

[5] CI-2 was convicted in 2006 for Driving Under the Influence of
Alcohol.  A records check of law enforcement databases indicates
that CI-2 was encountered by CBP in 2005, and was searched at
the U.S. border, at which time a revolver and 50 rounds of
ammunition were discovered.  CI-2 was assessed a $210.00
penalty, and the items were seized.  CI-2 has not received any
payments from HSI or IRS-CID.
[6] I attempted to access the Subject Website but observed that it
was accessible only with a username and password.

8.    In 2017, law enforcement officers interviewed CI-1,[7] who indicated that he/she was a bettor/client of the Subject Website and FUNKE.  During the interview, CI-1 indicated the following:

a.    CI-1 first met FUNKE in approximately 2010 when CI-1 was placing sports wagers through another sports betting website.  Between 2012 and 2013, CI-1 placed bets with FUNKE and the Subject Website and paid gambling losses by delivering cash and checks to certain entities owned or controlled by FUNKE.  A review of bank records of CI-1, FUNKE, and entities owned or controlled by FUNKE confirmed that CI-1 did in fact make payments to these accounts.

b.    In or about late 2013, CI-1 stopped gambling with FUNKE after CI-1 paid FUNKE approximately $5,000,000 in 2012, and $3,000,000 in 2013 as a result of gambling losses.

c.    In 2016, CI-1 decided to start gambling again, but CI-1 did not want to use his/her account with FUNKE.  CI-1 then began using another account at the Subject Website that belonged to CI-1's friend, CI-2, who CI-1 had previously introduced to FUNKE.

---

[7]  In late 2017, IRS-CID and HSI LA first interviewed CI-1, who provided information about FUNKE and other subjects.  Law enforcement officers were able to corroborate information CI-1 provided through other investigative means, thus the information provided was considered reliable.

9.   Beginning on May 31, 2018, the Honorable George H. Wu, United States District Judge, authorized a series of wire and electronic interceptions over the following telephones:

a.   818-749-3865 ("Target Telephone 1"),[8] a cellular telephone subscribed in the name of "Matthew R. FUNKE" at 4151 Redwood Ave, Apt 407, Los Angeles, California 90066-5632;

b.   818-599-1311 ("Target Telephone 2"), a cellular telephone subscribed in the name of "Wayne J. NIX" at 16030 Ventura Blvd, STE 240, Encino, California 91436;

c.   310-570-8411 ("Target Telephone 3"), a cellular telephone subscribed in the name of "Wireless Customer" at 2450 Lincoln Blvd., Venice, California 90291, and used primarily by NIX;

d.   323-893-2222 ("Target Telephone 4"), a cellular telephone subscribed in the name of "Edon Yoshida KAGASOFF" at 23431 Blue Bird Dr., Lake Forest, CA 92630;

e.   323-326-8855 ("Target Telephone 5"), a cellular telephone with no subscriber name, and believed to be used primarily by KAGASOFF.

---

8 During the interception period, FUNKE changed his phone number to 310-339-0707, but the new phone number retained the same International Mobile Equipment Identity ("IMEI") number as the original phone number, so the interception of Target Telephone 1 continued.  Both telephones will be referred to herein as Target Telephone 1.

      f.   800-429-5153 ("Target Telephone 6"), a telephone line issued by AVOXI, Inc., subscribed in the name of "CliffSite Travel" at "Pavas Blvd. in front of Cemaco.  COSTA RICA" and used primarily by the Sand Island Sports Group and the Subject Website;

      g.   877-789-9135 ("Target Telephone 7"), a telephone line issued by AVOXI, Inc., subscribed in the name of "CliffSite Travel" at "Pavas Blvd. in front of Cemaco.  COSTA RICA" and used primarily by the Sand Island Sports Group and the Subject Website; and

      h.   800-429-0395 ("Target Telephone 8"), a telephone line issued by AVOXI, Inc., subscribed in the name of "CliffSite Travel" at "Pavas Blvd. in front of Cemaco.  COSTA RICA" and used primarily by the Sand Island Sports Group and the Subject Website.

     B. <u>EVIDENCE RELATED TO SUBJECT PREMISES ONE</u>

    10.  Based on my investigation, there is probable cause to believe that evidence of the Subject Offenses will be found in SUBJECT PREMISES ONE.  SUBJECT PREMISES ONE is believed to be the residence of FUNKE.  The California Department of Motor Vehicles ("DMV") database indicates that FUNKE's home address is SUBJECT PREMISES ONE.  Law enforcement has seen FUNKE at SUBJECT PREMISES ONE on multiple occasions during surveillance, and as recently as January 29, 2020.  I have also reviewed subscriber

records from Frontier Communications that indicate that "Matt Funke" subscribes to FiOS internet services at 3601 Wade Street, APT 407, Los Angeles, California 90066-3619 (SUBJECT PREMISES ONE).[9]

11.  On June 2, 2018, law enforcement intercepted FUNKE over Target Telephone 1 advising an associate that he (FUNKE) had "50 sitting in the drawer in case while I'm gone to pay guys . . . ." Based on my training, experience, and knowledge of this investigation, I believe that by this statement FUNKE was advising his associate that FUNKE had stored $50,000 in U.S. currency at his residence, SUBJECT PREMISES ONE, in order to have funds available to pay gambling winnings while FUNKE traveled.[10]

12.  On July 10, 2018, FUNKE used Target Telephone 1 to receive a text message from KAGASOFF that said, "Hey boss 17740 owed for count 10k owed for loan can we meet tomorrow buddy Big guy pay yet???" Later that day, KAGASOFF sent another text message stating, "R u around Tomorrow so I can drop off cash." Based on my training, experience, and knowledge of this investigation, I believe the above exchange involves KAGASOFF agreeing to loan money to FUNKE until such time that FUNKE

---

[9] I believe that the listing of "APT 407" is an error, because SUBJECT PREMISES ONE is a single-family residence.
[10] DHS travel records confirm that FUNKE traveled to Europe during this time.

received gambling proceeds from a bettor, believed to be CI-1, that were owed to FUNKE.

13.   The following day, law enforcement observed KAGASOFF carrying a reusable grocery bag exit his residence in Lake Forest, California, and enter the passenger side door of a 2009 Audi coupe.  Law enforcement followed KAGASOFF and the Audi to SUBJECT PREMISES ONE.  An unidentified person exited the residence and approached the Audi.  The Audi then departed the area.  Approximately 1.5 hours later, law enforcement observed FUNKE exit the garage of SUBJECT PREMISES ONE while driving a 2005 Ford GT bearing California license plate "FUNK GT." Surveillance units followed FUNKE to a Wells Fargo Bank located in Marina Del Rey, California.  FUNKE entered the bank and was seen departing the bank approximately nine minutes later.

14.   On July 14, 2018, FUNKE used Target Telephone 1 to call NIX on Target Telephone 3.  During the call, FUNKE said he "got a guy . . . but [the bettor] wants to start playing like bigger baseball and like 5k per game . . . he's already won like 20 this week."  FUNKE continued that "if he gets hot . . . I don't have the bank right now."  NIX asked, "Did you hook up with Edon [KAGASOFF]" and FUNKE replied, "He got me 50 and with the 10 percent loan."  Based on my training, experience, and knowledge of this investigation, I believe FUNKE was indicating

11

that he had a bettor-client who wanted to raise his bets to a level that FUNKE could not financially support.

15.   On November 8, 2018, in an intercepted call, FUNKE and an associate discussed a loan and FUNKE's plans for continuing his gambling operation.  Specifically, FUNKE stated, "I'm gonna pay Wayne [NIX] back, I'm gonna pay my credit card off, I'm gonna pay one more thing and . . . I'll have like 150 in the bank plus whatever's in the drawer. . . ."  Based on my training, experience and knowledge of this investigation, I believe that FUNKE was again referring to keeping United States currency in his "drawer," which I believe to mean cash stored in a drawer in his residence (SUBJECT PREMISES ONE) that he uses to facilitate illicit gambling.

16.   On November 14, 2018, FUNKE used Target Telephone 1 to send text messages to KAGASOFF that described KAGASOFF picking up money from FUNKE's residence in FUNKE's absence. Specifically, FUNKE wrote, "If I'm out I'll leave it in the usual spot" and "Celsius box on floor.  My buddy might be at kitchen table studying.  Just a heads up.  Told him you're coming so just open it and grab buddy."  Later that day, KAGASOFF replied, "Got it stud locked door."  Based on my training, experience, and knowledge of this investigation, I believe that KAGASOFF was arranging to pick up money from FUNKE's residence, SUBJECT PREMISES ONE, in order for KAGASOFF

to pay bettor-clients who won money from gambling with the
organization.

17.  On January 10, 2019, FUNKE used Target Telephone 1 to
tell KAGASOFF on Target Telephone 4 that FUNKE had collected
"25" from a bettor-client and that it was "in the drawer too, at
home."  Based on my training, experience, and knowledge of this
investigation, I believe FUNKE was telling KAGASOFF that there
was $25,000 in a drawer in FUNKE's residence, SUBJECT PREMISES
ONE, so that KAGASOFF could pick up the money and distribute it
to bettor-clients.

18.  On October 18, 2019, law enforcement officers
conducted surveillance at SUBJECT PREMISIS ONE.  During the
course of the surveillance, the officers observed FUNKE exit
SUBJECT PREMISIS ONE, approach a vehicle outside of SUBJECT
PREMISES ONE, and receive a white envelope from an unidentified
male.  FUNKE re-entered SUBJECT PREMISIS ONE with the envelope.
The unidentified male was in a vehicle registered to Justin
BERKOWITZ, a target subject of this investigation.  Based on my
training, experience, and knowledge of this investigation, I
believe that the activity seen by surveillance is consistent
with the transfer of illegal gambling proceeds from FUNKE to
BERKOWTIZ.

19.  I have reviewed records from Wells Fargo Bank and Bank
of America for "Funke Entertainment" and learned that they are

associated with FUNKE.  SUBJECT PREMISES ONE is used as the
mailing address for both accounts.  The bank records reveal that
between December 20, 2012 and December 24, 2012, four checks
were written for $9000.00 each to Cliffsite Travel, a Costa
Rican-based company.  Cliffsite Travel is the listed subscriber
for phones which, based on wire interceptions, I believe are
used by the Subject Website.  On December 26, 2012, an
additional check for $6777.00 was written from Funke
Entertainment to Cliffsite Travel.  The indicated purpose of the
transactions were "Film Travel."  Based on my training,
experience, and knowledge of this investigation, I believe this
pattern of financial transactions is indicative of structuring
to avoid anti-money laundering reporting requirements imposed on
financial institutions.  I also believe these payments were
commission for using the Subject Website to facilitate FUNKE's
illegal gambling operation.  I believe that FUNKE, NIX, MILLER
and ARSENIAN continue to pay a commission (which the target
subjects refer to as a "headcount") for use of the Subject
Website, but I have been unable to identify how the proceeds are
transferred to the owners of the Subject Website at this time.

   C. EVIDENCE RELATED TO SUBJECT PREMISES TWO

      20.  Based on my investigation, there is probable cause to
believe that evidence of the Subject Offenses will be found in
SUBJECT PREMISES TWO.  SUBJECT PREMISES TWO is believed to be

the residence of NIX.  DMV records indicate that NIX's home
address is SUBJECT PREMISES TWO, and law enforcement officers
have seen NIX enter and exit SUBJECT PREMISES TWO on multiple
occasions during surveillance, as recently as January 15, 2020.
I have also reviewed subscriber records from Cox Communications
that indicate that "Wayne Nix" subscribes to high-speed internet
services at SUBJECT PREMISES TWO.

21.  On November 5, 2018, NIX used Target Telephone 3 to
speak to a person believed to a bettor-client known as Hamilton
Woodhouse JONES who gambles primarily through NIX.  During the
call, JONES identified himself as "Hamilton" and said, "I'll
fall off the radar for 20G's . . . I'm back in town.  I just
need a couple days . . .  I'll get everything together
. . . if Thursday or Fridays works."  NIX replied, "Thursday
works for me."  Based on my training, experience, and knowledge
of this investigation, I believe that NIX was arranging a time
and location to pick up $20,000 of gambling debt JONES owed to
NIX.

22.  On November 8, 2018, NIX used Target Telephone 2 to
speak with KAGASOFF.  During the call, NIX said that a "[bettor-
client] dropped off . . . I haven't counted it yet, but he
dropped a package off at my door-step today and I'm gonna meet
up with "Hamilton" [JONES] so we got a little something."

23.   Also on November 8, 2018, NIX used Target Telephone 2 to speak to an associate.  During the call, the associate said, "Did you get the, under the doormat?"  NIX replied, "I did, I'm gonna call in the payment here in about twenty minutes . . .  I haven't counted it yet, but . . . I'll do it and I'll text you." Based on my training, experience, and knowledge of this investigation, I believe that the associate left gambling proceeds on the doorstep of NIX's residence (SUBJECT PREMISES TWO), which NIX confirmed that he received.

24.   On November 9, 2018, NIX used Target Telephone 2 to speak to KAGASOFF on Target Telephone 4.  During the call, NIX said, "I got cash here that I picked up yesterday so . . . if it helps you out, I just took out about five grand of it 'cause I needed four for my bathroom . . . so I got cash in the safe here if you need some."  Based on my experience, training, and knowledge of this investigation, I believe that NIX was advising KAGASOFF that NIX received gambling proceeds and stored the proceeds in a safe in NIX's residence, SUBJECT PREMISES TWO.

25.   On November 15, 2018, NIX received a text message on Target Telephone 2 from KAGASOFF, who was using Target Telephone 4.  In the message, KAGASAOFF stated, "Package is in Mikey bed under covers make sure u grab it    Meet Brad here Starbucks 2311 Seal Beach Blvd #101, Seal Beach, CA 90740 He said around 10am checks cashing said all of it will be ready by tomorrow @".

16

Based on my training, experience, and knowledge of this investigation, I believe that KAGASOFF was advising NIX that KAGASOFF had left checks (for gambling losses) for NIX at SUBJECT PREMISIS TWO.  NIX was then to deliver the checks to an individual who would cash the checks on behalf of the organization.  I believe that "Mikey" refers to Michael OROZCO, a subordinate to NIX and believed to be another resident of SUBJECT PREMISIS TWO based on surveillance.  Finally, I also believe that in this text message, KAGASOFF was advising NIX that KAGASOFF had concealed the "package" in OROZCO's bed, which is located in SUBJECT PREMISES TWO.

26.  On June 30, 2019, NIX used Target Telephone 2 to call Target Telephone 6 (Sand Island Sports), and spoke to M. SOTO, believed to be a partial owner of Sand Island Sports.  During the call, NIX said "account number R172 . . . call a payment on that account for, I paid him $6,300 yesterday."  NIX continued, "put $3,000 on Djakovic to win Wimbledon."  Based on my training, experience, and knowledge of the case, I believe that NIX contacted Sand Island Sports for two purposes involving a bettor referred to as account R172.  First, it appears that R172 had previously won a bet, for which NIX owed him $6,300 in gambling winnings.  Second, NIX then placed another bet of $3,000 for R172 for the overall winner of the Wimbledon tournament.

17

27.  On October 29, 2019, surveillance was conducted at SUBJECT PREMISIS TWO.  Law enforcement followed NIX from SUBJECT PREMISES TWO to the "Mustard Café."  Surveillance officers followed NIX into the restaurant and observed NIX speaking to a male, who appeared to be an employee or owner of the restaurant. Officers observed NIX hand the male a bundle of cash as they discussed sports.  Shortly thereafter, NIX returned to SUBJECT PREMISIS TWO in his vehicle.

D. <u>EVIDENCE RELATED TO SUBJECT PREMISES THREE</u>

28.  Based on my investigation, there is probable cause to believe that evidence of the Subject Offenses will be found in SUBJECT PREMISES THREE.  SUBJECT PREMISES THREE is believed to be the residence of ARSENIAN.  The California DMV database indicates that SUBJECT PREMISES THREE is home address for ARSENIAN.  Law enforcement has seen ARSENIAN exit SUBJECT PREMISES THREE on multiple occasions, as recently as January 22, 2020.

29.  On November 28, 2018, NIX used Target Telephone 2 to call ARSENIAN at 949-887-7861, a number which is subscribed to ARSENIAN at SUBJECT PREMISIS THREE.  NIX asked ARSENIAN, "What cash do you have until, Edon [KAGASOFF] gets back?  I might need four (4) grand. . . ."  NIX and ARSENIAN continued to talk about money ARSENIAN owed NIX, and spoke about reconciling an account for "burns."  During the conversation, ARSENIAN said "fifty-

five, I gave you two on Monday, thirty-five and I owe you
thirty-five.  I can give you right now or whenever.  You want
four, I can give you four."  NIX continued to question ARSENIAN
by asking, "you got that user though.  You don't need to go to
your safety deposit?"  ARSENIAN then stated, "No, No.  I'm good.
I got it at home."  Based on my knowledge of this case, I
believe that NIX asked ARSENIAN for $4,000 related to gambling
proceeds.  When ARSENIAN said "I got it at home," I believe that
ARSENIAN was stating that he (ARSENIAN) had the money in his
home because he uses his residence to store a portion of his
gambling proceeds.

    30.  On June 18, 2019, ARSENIAN called Target Telephone 6
(Sand Island Sports), where ARSENIAN spoke with a principal of
Sand Island Sports, Matthew SOTO ("M. SOTO").  After greeting
M. SOTO, ARSENIAN stated "Hey . . . C546 . . . he's fifty (50)
dollar place holder.  I don't know if you saw them."  ARSENIAN
also stated "there's four (4) games . . . .  You know the
games?"  ARSENIAN later clarified, "Oakland, Kansas City, and
San Diego."  M. SOTO replied, "Yeah . . . those one's are five-
hundred (500) plays .  . . .  I'll switch them right now. . . ."
Based on my training, experience and knowledge of this
investigation, I believe that "C546" is the number the
organization uses to identify a particular bettor.  I believe
that ARSENIAN was confirming with M. SOTO that bets have been

successfully logged with the Subject Website, and was confirming the amount.

31.  On July 1, 2019, ARSENIAN called Target Telephone 6, where ARSENIAN spoke with a Sand Island Sports employee named "Chris."  ARSENIAN identified himself as "Wheel 1" and stated, "Hey, what's up, man?  A couple of payments."  ARSENIAN then stated, "R19-02 . . . paid us ten thousand."  ARSENIAN continued, "And then reset C-5-46 . . . he lost one twenty-one, seven, one, one [121,711]."  Chris acknowledged and then asked, "How much did he have available, sir?"  ARSENIAN replied, "put a hundred thousand (100,000) available for this week."  Based on my training, experience and knowledge of this investigation, I believe that ARSENIAN advised Sand Island Sports of a $10,000 payment from bettor R19-02 for an outstanding gambling debt. ARSENENIAN also advised that bettor C-5-46 paid a sports gambling loss of $121,711.00 to the organization.  ARSENIAN then instructed Chris to give the bettor a credit line of $100,000.00 over the coming week to place additional bets.

32.  On October 24, 2019, law enforcement officers conducted surveillance on ARSENIAN.  The officers followed ARSENIAN from SUBJECT PREMISIS THREE to 220 Newport Center Drive in Newport Beach, an office complex.  At approximately 10:00 am, while remaining in his vehicle in the parking lot, ARSENIAN was observed handing a white envelope to an unidentified female.

20

The female walked back up on the curb of the sidewalk in the front of the office complex, and joined an unidentified male, and together the unidentified male and female walked up stairs to an unknown suite inside the building.  ARSENIAN remained in his vehicle during the exchange, and drove off immediately following the transaction.  Based on my knowledge of the practices of bookmakers, I believe that the curbside exchange witnessed by surveillance is consistent with the transfer of illegal gambling proceeds.

33.  I have reviewed banking information for ARSENIAN, including a personal checking account from Wells Fargo bank ending in XXXX5311 and a business account from Bank of America ending in XXXX5523.  The Wells Fargo account is subscribed to ARSENIAN at SUBJECT PREMISES THREE, and the Bank of America account is subscribed to KMA Partners, a company associated with ARSENIAN, at SUBJECT PREMISES THREE.  From my review of ARSENIAN's bank accounts, I observed large cash deposits and electronic transfers/debits in both accounts that I believe are related to the Subject Offenses.  Specifically, during my review of the Wells Fargo personal checking account ending in XXXX5311, I observed cash deposits of $4800.00 on June 22, 2018; $7000.00 on February 19, 2019; and $7300.00 on April 18, 2019.  In the same account, I also observed a PayPal deposit of $4035.68 on September 23, 2019; and a Venmo deposit of $1000.00 on August 9,

2019.  During my review of the Bank of America business account
ending in XXXX5523, I observed cash deposits of $5000.00 on
February 11, 2019; $5000.00 on March 9, 2019; and $17,000.00 on
March 12, 2019.  In that same account, I observed a Venmo debt
of $1350.00 on August 6, 2019; a Venmo debit of $2000.00 on
August 14, 2019; a PayPal debit of $1613.95 on September 4,
2019; and a PayPal deposit of $4,400 on September 23, 2019.
Based on my training, experience, and knowledge of this
investigation, I know that illegal bookmakers will typically
operate in cash and often utilize Venmo and Paypal to facilitate
the gambling operation.   I also believe that transactions
observed in ARSENIAN's accounts are consistent with illegal
bookmaking, and that further evidence of ARSENIAN's financial
activity will be found in SUBJECT PREMISES THREE.

E. EVIDENCE RELATED TO SUBJECT PREMISES FOUR

34.  Based on my investigation, there is probable cause to
believe that evidence of the Subject Offenses will be found in
SUBJECT PREMISES FOUR.  SUBJECT PREMISES FOUR is believed to be
the residence of MILLER.  The California DMV database indicates
that MILLER's home address is SUBJECT PREMISES FOUR.  Law
enforcement has seen MILLER enter and exit SUBJECT PREMISES FOUR
on multiple occasions, as recently as December 12, 2019.

35.  On June 18, 2019, MILLER used 310-739-6447, a phone
which is subscribed to MILLER at SUBJECT PREMISIS FOUR, to place

a call to Target Telephone 6 (Sand Island Sports), where MILLER
spoke with Daniel SOTO ("D. SOTO"), a principal of Sand Island
Sports.  MILLER advised, "Hey, I'm on my way to the house now
. . . You said you were gonna give me three hundred (300). . .
am I giving her ninety-three (93) or ninety (90)?  D. SOTO
replied, "Oh, no . . . I was gonna give you three (3) . . .  if
you were gonna wire the money for me."   MILLER later clarified
his instructions and told MILLER to "give her a nine (9), and
then tell Joe you gave me ninety-six (96)."  Later that day, law
enforcement officers conducted surveillance at a residence in
San Pedro, California, in which D. SOTO's mother resides.  The
officers observed a vehicle registered to "Robert N. Miller" at
SUBJECT PREMISIS FOUR arrive at the residence of M. SOTO's
mother.  The driver, a white male resembling MILLER, entered the
residence and departed shortly thereafter.  Based on my
training, experience, and knowledge of this investigation, I
believe MILLER and D. SOTO were discussing the transfer of
illicit gambling proceeds to D. SOTO.  Specifically, it appeared
that D. SOTO had initially agreed to pay MILLER $300.00 if
MILLER wired money to D. SOTO in Costa Rica, but they later
arranged for MILLER to deliver the money to D. SOTO's mother in
San Pedro, California.  I believe that "Joe" is Joseph CASTALAO,
a partner in Sand Island Sports.

36.   On June 19, 2019, MILLER used 310-739-6447 to call
Target Telephone 6 (Sand Island Sports), where MILLER spoke to
D. SOTO.  During the call, MILLER stated, "Good morning. 2650."
D. SOTO inquired, "2650 . . . Rich?"  MILLER replied, "Yeah
. . . paid two-fifty (250)."  D. SOTO then asked, "Where's your
other buddy . . . is he broke or what? . . . I haven't got any
payments from you in a while."  MILLER replied, "he sent me a
date where . . .  he's gonna send me money.  I think it's next
week."  D. SOTO replied, "they all run out sooner or later."
MILLER ended the call by stating, "I'll let you know . . . Ken's
. . . amount."  Based on my training, experience, and knowledge
of this investigation, I believe that "2560" is the numerical
identifier for a gambler named "Rich," who made a payment for
gambling losses.  During the call, D. SOTO also inquired about
MILLER's "other buddy," who I believe is a gambler with an
outstanding gambling debt owed to Sand Island Sports.  D. SOTO
also noted that gamblers routinely run out of money to pay their
gambling debts "sooner or later."  MILLER ended the call by
advising D. SOTO that MILLER is attempting to calculate the
amount of money that "Ken" (ARSENIAN) owes the organization.
This leads me to believe that MILLER has a role in collecting
money that bookmakers, such as ARSENIAN, owe to Sand Island
Sports.

37.   Between June 24, 2019, and July 8, 2019, MILLER was intercepted discussing the payment and collection of gambling proceeds over Target Telephone 6 (Sand Island Sports) related to a bettor referred to as "1718."  I have compared the information in those calls to a PayPal account ending in 8564 subscribed to MILLER at SUBJECT PREMISIS FOUR and believe that I have identified several financial transactions used to pay and collect proceeds from bettor "1718."  For instance, on June 24, 2019, MILLER told an employee of the Subject Website that "1718 . . . mark him paid his 518."  A review of MILLER's PayPal transactions revealed that MILLER's account paid "Kyle Cruikshank" $518.00 on June 24, 2019.  On July 2, 2019, MILLER advised M.SOTO at the Subject Website that "1718 . . . Mark him paid a dime."  On the same date, MILLER's PayPal account received $1,000 from "Kyle Cruikshank."  On July 7, 2019, MILLER advised an employee of the Subject Website that "1718. Mark and pay a dime."  MILLER's PayPal account again received $1000.00 on July 7, 2019 from "Kyle Cruikshank."  On July 8, 2019, MILLER advised M.SOTO that "1718 . . . I paid him his weekend in . . . 634."  On the same date, MILLER's PayPal account paid "Kyle Cruikshank" $634.00.  A further review of MILLER's PayPal account revealed a financial transaction with "Kyle Cruikshank" as recently as October 21, 2019.  Based on my training, experience, and knowledge of this investigation, I believe that

25

"1718" is a bettor designation for "Kyle Cruikshank," and MILLER is using his PayPal account to conduct financial transactions related to illegal gambling.

38. I have also reviewed bank records from JP Morgan Chase for an account ending in XXXX6644 subscribed to MILLER at SUBJECT PREMISIS FOUR. I reviewed a bank statement which indicated that MILLER sent a wire transfer of $8300.00 on October 13, 2016, to "Cliff Site Travel" at Scotia Bank in Costa Rica. Based on my training, experience, and knowledge of this investigation, I believe this is the same bank account used by D. SOTO and M. SOTO for Sand Island Sports. In addition, on May 4, 2017, MILLER sent a money order for $500 payable to "Don Best Sports" and included a hand-written notation: "S Island l." The money order also contains MILLER's signature and the address of SUBJECT PREMISES FOUR on the money order. Based on my training, experience, and knowledge of this investigation, I believe that evidence of MILLER's use of the financial system in furtherance of illegal gambling will be found at SUBJECT PREMISIS FOUR.

39. On October 25, 2019, law enforcement officers conducted surveillance on SUBJECT PREMISIS FOUR. MILLER was observed exiting the residence, retrieving either papers or an envelope from his vehicle, and then re-entering SUBJECT PREMISIS FOUR. Later that afternoon, surveillance followed MILLER from SUBJECT PREMISIS FOUR to a post office in Gardena, California.

26

Before exiting his vehicle while at the post office, surveillance observed MILLER reach into the back of his vehicle and place a small item in his front pocket, and then enter the post office.  Shortly thereafter, MILLER was observed departing the post office empty handed.  Based on my knowledge of the practices of illegal bookmakers, I know it is common for gambling proceeds to be transmitted by U.S. Postal mail and/or money orders; however, the United States Postal Service was unable to locate any money order transactions in MILLER's name on this date.

40.  On December 12, 2019, HSI again conducted surveillance of MILLER at SUBJECT PREMISIS FOUR.  During the course of the surveillance, MILLER was observed departing SUBJECT PREMISIS FOUR and driving to several locations for unknown reasons.  For instance, law enforcement followed MILLER to a parking lot of a liquor store in Gardena, California.  MILLER was observed meeting with an unidentified male in the parking lot of the liquor store for approximately twenty minutes, but MILLER did not enter the liquor store.  Next, MILLER travelled to the parking lot of a bar in Hawthorne, California, and met with another unidentified male for approximately ten minutes, but MILLER again did not enter the location (the bar).  Next, MILLER drove to a furniture installation business in Rancho Dominguez, California, where MILLER parked and entered the business on

27

foot; however, law enforcement was unable to follow MILLER
inside the business.  MILLER was at the Rancho Dominquez
business for approximately thirty-four minutes before driving
back to SUBJECT PREMISIS FOUR.

F. PRACTICES OF ILLEGAL BOOKMAKERS

41. Based upon my training, experience, and knowledge of
this investigation, I know a large-scale illegal gambling
operation requires the cooperation and association of numerous
individuals within the organization, including gamblers.  As a
result, "bookmakers" like NIX, FUNKE, MILLER, and ARSENIAN will
often possess documents that will identify other members of the
organization and customers, such as records, receipts, notes,
ledgers, tally sheets, and other papers regarding illegal
gambling or reflecting the proceeds of illegal gambling.  Based
on my training, experience, and knowledge of this investigation,
I believe these records will be maintained in both paper and
electronic form.

42. Based upon my training, experience, and knowledge of
this investigation, I also believe that bookmakers typically
keep checks, money orders, and money-counters in their
residences.  In addition, bookmakers that settle accounts in
person will also keep cash on hand in their residences to settle
accounts to avoid numerous trips to banks and avoid reporting
requirements.  Further, bookmakers that use websites to

28

facilitate their gambling operation will typically use computers and digital devices that are kept and/or stored in their residences to check the status of bets, grant new customers access to the website, and keep electronic spreadsheets of their customers and transactional history.

43.   It has been my experience that co-conspirators will also retain names, addresses, email and telephone numbers of other co-conspirators involved in the organization much in the same way as a business will maintain those records, and that such records are often kept in their residences.

## VI.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[11]

44.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

[11] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

30

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

i.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress FUNKE's, NIX's, MILLER's and ARSENIAN's
thumb- and/or fingers on the device(s); and (2) hold the
device(s) in front of FUNKE's, NIX's, MILLER's and ARSENIAN's
face with his or her eyes open to activate the facial-, iris-,
and/or retina-recognition feature.

47.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

//

//

//

33

## VII. <u>CONCLUSION</u>

48.   Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1084 (Transmission of wagering information); 18 U.S.C. § 1955 (Operation of an illegal gambling business); and 18 U.S.C. § 1956(a)(2)(Internationally laundering the proceeds of the illegal gambling business), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachments A-1, A-2, A-3, and A-4, of this affidavit.


_____
Michael Impastato
Special Agent, United States
Homeland Security Investigations


Subscribed and sworn to before
me this _____ day of February 2020.

_____

34

## ATTACHMENT "A-1"

The premises that are subject to search pursuant to this Search Warrant are described as follows:

SUBJECT PREMISES ONE is located at 3601 Wade Street, Los Angeles, California 90066.  It is a two-story, single-family residence located at the southwest corner of the T-intersection of Wade Street and Marco Place.  The front door of the residence is covered by a small overhang.  The front door faces Wade Street; it appears to be made of glass and is framed in beige colored wood.  On a short cement wall facing Wade Street are the numbers "3601" (which appear to be metal).  The numbers "3601" are stenciled on the curb in front of the residence.  The outer residence wall facing Wade Street is a light gray colored façade and medium toned wood paneling.  The portion of the property facing Marco Place is enclosed by a gray cement wall, with a break for a wood paneled gate which provides access to a detached garage.

## ATTACHMENT "A-2"

SUBJECT PREMISES TWO is located at 28 Castellina Drive, Newport Beach, California 92630.  This address is the third structure on the west side of Castellina Drive at the south end of the cul-de-sac.  There is a black mailbox labeled with the numbers "28" facing west on Castellina Drive and there is a yellow fire hydrant near the front yard.  It is a brown two-story residence facing west identified with the numbers "28" etched in stone on the wall facing the street.  The residence has two brown garage doors facing the street and the attached garage has a stone façade.  There is a small dark water fountain near the walkway leading to the brown front door entrance.  There is a large window facing the street just north of the front door.  The second story appears to be an open patio.  The residence has a Spanish tile roof.

## ATTACHMENT "A-3"

SUBJECT PREMISES THREE is described in Attachment A and is located at 3301 Clay St., Newport Beach, CA 92663.  This address is the first structure on the northwest corner of Clay St. and Bolsa Ave.  It is a tan colored two-story townhouse with a red Spanish-tiled roof with two units sharing a common wall.  There is a solid short wall around a court yard in front of the residence.  A short black rod-iron gate is used to control access to the court yard and the front door.  The numbers "3301" are hung on the wall to the right-side of the front door. The garage is located in the rear of the residence in an alley way that provides garage access to approximately seven other units. The garage door, which is on the south-east corner for the alley way and closest to Bolsa Ave. has a light brown-colored door.

## ATTACHMENT "A-4"

SUBJECT PREMISES FOUR is located at 1043 W. 186th St., Gardena
CA 90248.  This address is the second structure west of the
northwest corner of 186th St. and New Hampshire Ave.  It is a
light tan colored two-story single-family residence with a grey
roof.  The garage is located to the left of the front door with
a stone facing surrounding the frame of the white and terracotta
garage door.  There is a large window just above a slab of stone
facing just to the right of the front door. The numbers "1043"
are printed on a sign also to the right of the front door.  The
numbers "1043" are also printed on the curb in front of the
residence to the right of the driveway apron.  The front and
backyard are separated with a brick fence with two wooden gates
on either side of the residence providing access between the two
yards.

## ATTACHMENT "B"

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1084 (Transmission of wagering information); 18 U.S.C. § 1955 (Operation of an illegal gambling business); and 18 U.S.C. § 1956(a)(2)(Internationally laundering the proceeds of the illegal gambling business)(Collectively, the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to the placement of gambling bets, claims for payment, customer lists, ledgers of wagers, and address books;

b.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to Sandislandsports.com, Cliffsite Travel, or associated entities or persons;

c.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that consist of bank statements, deposit slips, withdrawal slips, checks, cashier's checks, money orders, and wire transfer records;

39

      d.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to bank accounts, digit currency or cryptocurrency, and safety deposit boxes;

      e.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to purchases with proceeds from the Subject Offenses;

      f.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to hiding assets or proceeds from the Subject Offenses;

      g.   U.S. currency and U.S. currency equivalent greater than $2,000;

      h.   Indicia of ownership, residency, or occupancy of the SUBJECT PREMISES and things described in this warrant including records, documents, programs, applications and materials that consist of utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes, keys, and bank account records;

      i.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages,

40

that relate to storage facilities or units, building space, and post office boxes;

　　　　j.　Any digital device used to facilitate the above-listed violations and forensic copies thereof.

　　　　k.　With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

　　　　　i.　evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

　　　　　ii.　evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

　　　　　iii. evidence of the attachment of other devices;

　　　　　iv.　evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

　　　　　v.　evidence of the times the device was used;

41

            vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

            vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

            viii. records of or information about Internet Protocol addresses used by the device;

            ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart

42

phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

c.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

d.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e.    The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

f.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

g.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

h.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

j.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

46

k.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

47

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Matthew FUNKE's, Wayne NIX's, Kenneth ARSENIAN's, and Howard MILLER's, thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of FUNKE's, NIX's, MILLER's, and ARSENIAN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.